**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————————— )
                                        )
CARLOS BENTO DOS REIS,                  )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )       Civil Action No.
                                        )       16-10011-PBS
MICHAEL J. MCCLEARY, Acting             )
Director, Boston Field Office,          )
United States Citizenship               )
and Immigration Services,               )
et al.,                                 )
                                        )
            Defendants.                 )
———————————————————————— )


**MEMORANDUM AND ORDER**

August 11, 2016

Saris, C.J.


**INTRODUCTION**

The plaintiff, Carlos Dos Reis, seeks *de novo* review of the United States Citizenship and Immigration Service's (USCIS) denial of his petition for naturalization. The government argues that this Court should deny the plaintiff's petition because (1) his marriage to a United States citizen was a sham, and (2) he has not shown good moral character during the five-year statutory period because he made false statements under oath to USCIS, underreported his taxable income, and failed to support his children. After a one-day bench trial, this Court finds that the plaintiff (1) had the requisite intent to start a married

1

life with his wife at the time of their marriage, (2) made false statements under oath to USCIS to obtain an immigration benefit, and (3) willfully failed to make child support payments to his dependents. The Court declines to find that he underreported his taxable income. Therefore, the plaintiff has not proven by a preponderance of evidence that he meets the statutory requirement of good moral character and his petition for naturalization (Docket No. 1) is **DENIED**.

**FINDINGS OF FACT**

I.   **Background**

The plaintiff arrived in the United States from Brazil on March 10, 2002 on a tourist visa. To obtain the visa, he was required to affirm that he did not intend to permanently remain in the United States. The visa did not permit him to work, expired after six months, and allowed him to leave and return to the United States. Within one month of arriving, Dos Reis purchased a vehicle and began to work at McDonald's. After working at McDonald's for a short time, he got a job as a painter, and, in 2003, started his own painting business where he currently employs seven other painters. A hard worker, Dos Reis regularly works eleven hour days, six days per week. Shortly after arriving in the country, he decided to remain here

because of the increased economic opportunities in this country. He was eager to become an economic success.

## II.  **Marriage**

Shortly after arriving, Dos Reis's former girlfriend in Brazil notified him that she was pregnant with his child. Despite this pregnancy, he decided to stay in the United States. The child was born on May 10, 2002. He visited the child five times during return trips to Brazil.

In 2004, Dos Reis entered into a relationship with another woman, a Brazilian citizen, in Braintree, Massachusetts. The couple moved in together and the relationship was heading towards marriage. However, the relationship was rocky and the couple fought regularly. In January 2005, Dos Reis was arrested for the assault and battery of his girlfriend, but she later bailed him out of jail and dropped the charges. Ex. 28. His girlfriend became pregnant with Dos Reis's second child. He never married her.

At around this time, the plaintiff met Sherry Mouzer at a party in Weymouth Commons, an apartment complex in Weymouth, Massachusetts, where they both lived. The two had separate apartments, each with multiple roommates. Dos Reis was attracted to Mouzer, her blond hair and green eyes, and wanted to pursue a relationship with her. The two began dating. Mouzer and Dos Reis saw a movie on their first date. Mouzer, age twenty at the time,

had just broken up with her drug trafficking boyfriend, had an arrest record, and abused drugs. She did not disclose her drug issues to Dos Reis. She found Dos Reis to be handsome and viewed him as her savior from her bad situation.

About three to six months after the couple met, Dos Reis proposed marriage and Mouzer accepted. He gave her a gold ring and a flower. The couple was married by a justice of the peace on July 8, 2005. No one from Mouzer's family attended the wedding and she did not tell her mother about the marriage until several months afterwards. Dos Reis had two guests present, his sister and a friend. After the wedding, he and Mouzer saw each other almost every day, but they continued to live in their separate apartments, because of their multiple roommates. On October 21, 2005, Dos Reis's second child was born.

In December 2005, Dos Reis purchased his house at 59 Michele Drive in Weymouth. Mouzer's name is not on the deed or the mortgage to the house. Dos Reis put down $28,000 on the $450,000 house. Mouzer moved into the house with Dos Reis. Though not working regularly, she participated in household chores and helped Dos Reis in his painting business by occasionally painting and translating for him when he interacted with his clients. The plaintiff provided a DISH bill from December 2005, a Comcast cable bill from January 2006, and a

water consumption report from December 2005 all addressed to both Dos Reis and Mouzer at 59 Michele Drive. Exs. 13, 17-18.

## III. **Marriage Deterioration**

Beginning in mid-2006, the marriage began to deteriorate. Mouzer, who still struggled with drug addiction, spent more time away from the couple's home with her old friends from her hometown of Marshfield, Massachusetts. She would stay with her mother in Marshfield, at various hotels and friends' apartments, and at institutional rehabilitation centers. She did not tell Dos Reis where she was staying. Although it is unclear whether he knew before their marriage about her continuing drug addiction, he became aware of Mouzer's issues when she was taken to the hospital after overdosing in 2007. He also learned that she had turned to prostitution to finance her drug habit when he read an article about her arrest in a prostitution sting in 2008. Ex. 51. She was arrested fourteen times after the couple married.

The couple separated in November 2006. From mid-2006 through 2011, in Mouzer's Registry of Motor Vehicle records, police and court records, and Department of Transitional Assistance (DTA) records, she only listed 59 Michele Drive as her address twice. Exs. 35, 36, 38, 48, 51, 52, 58, 62, 63, 67. In early 2006, Mouzer applied to change her vehicle registration address to the marital home. Ex. 36. Mouzer received food stamps

and health insurance separate from Dos Reis during the couple's marriage. Ex. 38. When Mouzer stayed in the hospital in 2007 after her drug overdose, Dos Reis did not pay any of the medical bills. In the couple's 2011 divorce petition, they averred that they "last lived together at 59 Michele Dr. Weymouth, MA 02190 on November 2006." Ex. 72. Both Mouzer and Dos Reis signed the petition.

## IV.   **The One-Night Stand**

In late 2006 or early 2007, Keidia Lima and her husband Brad Gibbs moved into the basement apartment of Dos Reis's house. Dos Reis charged the couple $1,100 per month in rent, which they paid largely in cash. Lima and Dos Reis had a "one-night stand" in October 2007 that resulted in Lima's pregnancy with Dos Reis's third child. Mouzer was off with her drug associates when Lima became pregnant and was upset when she learned of the pregnancy. Lima's husband moved out. Mouzer's life was spiraling out of control with drugs and prostitution. The plaintiff's third child was born on August 20, 2008.

While Lima and Dos Reis insist that they did not have a long-term relationship, shortly after the baby was born, Lima, Dos Reis, and the baby traveled to Brazil so Lima's family could meet the baby. Dos Reis paid for their plane tickets, and during the trip, he spent several days meeting Lima's family. They all traveled back to the United States together. Neither Lima's

husband nor Mouzer accompanied them on this trip. Indeed, Mouzer never met the plaintiff's family. Lima and the baby continued to live in Dos Reis's basement apartment for seven months after the child's birth and eventually moved out in March 2009.

## V.   **False Testimony**

On September 7, 2005, the plaintiff filed his application for lawful permanent resident (LPR) status. Mouzer's support petition affirming that the couple was married accompanied this application. After an LPR interview on January 26, 2006, USCIS approved Dos Reis's application on February 25, 2008.

On December 20, 2010, the plaintiff filed his first naturalization petition, and USCIS interviewed him on April 5, 2011. In his April 2011 interview, the USCIS officer placed Dos Reis under oath and asked him questions based on his naturalization petition. Ex. 65. During the interview, the plaintiff affirmed that he had been "married to and living with the same United States citizen for the last three years . . . ." Ex. 65. He answered no to the question: "Have you **ever**: Failed to support your dependents or to pay alimony?" Ex. 65 (emphasis in original). In response to questions about his criminal background, Dos Reis disclosed his January 2005 arrest for assault and battery of his ex-girlfriend. Ex. 65.

At the interview, USCIS requested more information about Dos Reis's marriage, and in response, Dos Reis submitted his

7

healthcare proxy, will, and durable power of attorney, all
naming Sherry Mouzer as his beneficiary. Ex. 71. These documents
were executed on May 3, 2011, <u>after</u> the request for information.
USCIS denied Dos Reis's first naturalization petition on April
16, 2012.

On March 4, 2013, the plaintiff filed his second
naturalization petition. USCIS placed the plaintiff under oath
and interviewed him regarding his second petition on June 13,
2013. Ex. 77. He answered no to the question: "Have you **ever**:
Failed to support your dependents or to pay alimony?" Ex. 77
(emphasis in original). On November 25, 2013, USCIS denied the
plaintiff's second naturalization petition and the plaintiff
appealed. He again disclosed his January 2005 arrest for assault
and battery of his ex-girlfriend and an additional arrest for
driving without a license. Ex. 77.

On April 8, 2014, Dos Reis was placed under oath in a
videotaped interview conducted by a USCIS officer as part of his
appeal. Exs. 84, 86. In that interview, the USCIS officer asked
Dos Reis, "How long were you living with your wife?" Dos Reis
responded: "Since the day we married . . . until 2011." Ex. 86.
Dos Reis also stated that, "when we married, we lived together,
just me and her." Ex. 86. When asked about the couple's wedding,
Dos Reis told the USCIS officer that Mouzer's mother had
attended the wedding along with several other guests. Ex. 68. On

September 9, 2015, USCIS affirmed its earlier decision and denied the plaintiff's second naturalization petition. The plaintiff sought review in the district court pursuant to 8 U.S.C. § 1421(c).

## VI.  **Child Support**

On April 14, 2006, the Norfolk Probate Court ordered Dos Reis to pay $230 per month in child support for his second child. Ex. 37. On May 17, 2007, the court found him guilty of contempt "for having willfully neglected and refused to pay child support, the arrearage of which is fixed at $2,862." Ex. 44 at 3. The court found him guilty of contempt two more times on April 28, 2008 and June 11, 2010. Exs. 50, 60. The arrearage amounts were $2,400 and $9,038.45, respectively. Exs. 50, 60. The court stated that it "did not credit the accuracy of the defendant's financial statement—he owns his own company, he has boarders in the home he owns." Ex. 60.

In November 2009, the probate court entered a child support order requiring Dos Reis to pay $140 per week to support his third child. Dos Reis was often behind in his child support payments during the baby's early years, sometimes by as much as a few thousand dollars. There are no records of any contempt orders with respect to child support for his third child. However, Dos Reis made a payment of $10,817.85 to the Massachusetts Department of Revenue on May 4, 2011 which paid

his child support arrearage in full for both children. Ex. 8. It
is not clear what portion of this payment went to support each
child.

Dos Reis testified that he could not afford to pay the
amount of child support ordered because his business was not
making enough money and he was experiencing financial trouble.
Although Dos Reis claimed that he continued to pay smaller
amounts of money when he could afford to, he produced no
documentary evidence of these payments. Between 2007 and 2011,
Dos Reis made six trips to Brazil and one to Mexico. Exs. 69,
75. In 2009, he purchased a parcel of land in Brazil and built a
house there, but could not remember how much money he paid for
it. He admitted that his January 2010 trip to Brazil was for the
purpose of checking on this real estate investment. I find that
Dos Reis failed to pay his child support obligations,
particularly for his second child, without justification.

## VII. Taxes

After purchasing his house at 59 Michele Drive, Dos Reis
began paying approximately $3,000 per month towards the
mortgage. Beginning in late 2006, he rented out his basement to
tenants, charging $1,100 per month from 2007 to 2010, and $850
per month in 2011. Exs. 41, 55, 66.

In his tax returns, Dos Reis reported an adjusted gross
income of $13,308 in 2005, married filing jointly; $12,056 in

2006, married filing jointly; $4,896 in 2007, filing single;
$823 in 2008, filing single; $9,085 in 2009, married filing
separately; $13,000 in 2010, married filing separately; and
$9,325 in 2011, married filing separately. Exs. 1, 40, 78. He
did not file his 2009 tax return until March 31, 2011, and did
not file his 2011 tax return until April 8, 2013. Exs. 71, 78.
Although he admitted receiving rental income in 2011, his 2011
tax return lists no "income or loss from rental real estate."
Ex. 78. Dos Reis used several different tax preparation services
to prepare and file his taxes.

## DISCUSSION

### I.   Standard of Review

"A person whose application for naturalization under this
subchapter is denied, after a hearing before an immigration
officer . . . may seek review of such denial before the United
States district court for the district in which such person
resides." 8 U.S.C. § 1421(c). "Such review shall be de novo, and
the court shall make its own findings of fact and conclusions of
law and shall, at the request of the petitioner, conduct a
hearing de novo on the application." Id. "The court may not rely
on the INS's findings of fact or law . . . ." United States v.
Hovsepian, 359 F.3d 1144, 1162 (9th Cir. 2004); see also Chan v.
Gantner, 464 F.3d 289, 291 (2d Cir. 2006) ("[T]he district court
has the final word and does not defer to any of the INS's

findings or conclusions." (quoting Hovsepian, 359 F.3d at 1162 (alterations omitted))). "Judicial review of naturalization denials . . . is not limited to any administrative record but rather may be on facts established in and found by the district court de novo." Aparicio v. Blakeway, 302 F.3d 437, 445 (5th Cir. 2002).

"The applicant shall bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization . . . ." 8 C.F.R. § 316.2(b). The government "has a strong and legitimate interest in ensuring that only qualified persons are granted citizenship," and "[f]or these reasons, it has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect." Berenyi v. Dist. Dir., INS, 385 U.S. 630, 637 (1967). The "Supreme Court has consistently held that 'no alien has the slightest right to naturalization unless all statutory requirements are complied with.'" Koszelnik v. Sec'y of Dep't of Homeland Sec., No. 14-4816, 2016 WL 3648369, at *2 (3d Cir. July 8, 2016) (quoting United States v. Ginsberg, 243 U.S. 472, 475 (1917) (alteration omitted)).

### A. Lawful Admission as Permanent Resident

The government argues that, because the plaintiff entered into his marriage solely for the purpose of gaining immigration status as a lawful permanent resident, he was never lawfully

12

admitted for permanent residence. The plaintiff responds that he intended to start a life with his wife and that, only after learning of his wife's drug addiction, did his marriage break down.

"[N]o person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence . . . ." 8 U.S.C. § 1429; see also 8 U.S.C. § 1427(a) ("No person . . . shall be naturalized unless such applicant . . . has resided continuously, after being lawfully admitted for permanent residence, within the United States . . . ."). "An alien may obtain LPR status under the INA by virtue of his marriage to a citizen of the United States." Gallimore v. Attorney Gen. of U.S., 619 F.3d 216, 221–22 (3d Cir. 2010). Where the immigrant has "acquired permanent resident status by fraud or misrepresentation . . . they have not been lawfully admitted for permanent residence." Mejia-Orellana v. Gonzales, 502 F.3d 13, 16 (1st Cir. 2007). "The natural reading of 'lawful' connotes more than just procedural regularity; it suggests that the substance of an action complied with the governing law." Id. (quoting De La Rosa v. U.S. Dep't of Homeland Sec., 489 F.3d 551, 554 (2d Cir. 2007)).

When evaluating whether a marriage was bona fide, the "substantive question is whether, at the time of the marriage, there was an 'intent to establish a life together.'" Rodriguez

13

v. INS, 204 F.3d 25, 27 (1st Cir. 2000) (quoting Bark v. INS, 511 F.2d 1200, 1201 (9th Cir. 1975) (alterations omitted)); see also McKenzie-Francisco v. Holder, 662 F.3d 584, 587 (1st Cir. 2011) ("To carry this burden, he must show that, at the time that the newlyweds plighted their troth, he intended to establish a life with his spouse."). "While good faith is evaluated at the time of the marriage . . . activity before and after the moment of marriage is relevant to the inquiry." Jing Lin v. Holder, 759 F.3d 110, 112 (1st Cir. 2014).

When determining whether a petitioner enters into a marriage in good faith, the First Circuit considers "documentary evidence, such as a joint bank account or general commingling of assets, which typically accompanies a valid marriage," and whether the couple "jointly enrolled in a health insurance policy, filed tax returns, opened bank accounts, entered into automobile financing agreements, and secured a credit card." Cho v. Gonzales, 404 F.3d 96, 103 (1st Cir. 2005). The court also looks to the amount of time the couple lived together during their marriage and whether they can recall details about their married lives. See Jing Lin, 759 F.3d at 112; Rodriguez Del Carmen v. Gonzales, 441 F.3d 41, 43-44 (1st Cir. 2006) (finding that the marriage was not bona fide and noting that the petitioner's spouse "was unable to recall important details of her putative married life").

14

This Court finds that, at the time Dos Reis and Mouzer married in July 2005, Dos Reis intended to start a married life with her. The Court relies on the testimony of four witnesses that the couple lived together in Weymouth after the plaintiff purchased a home there, and the relatively consistent story about the couple's courtship. They lived in the same apartment complex and met at an event on the property. They went to a movie on their first date, although they could not remember which movie. He gave her a ring and a flower and they lived apart for the first four months of their marriage because of their multiple roommates. Things were going smoothly during the first months of the marriage and Mouzer helped around the house and with Dos Reis's business. Before long, because of Mouzer's drug abuse, the marriage began to break down. Mouzer stayed at 59 Michele Drive less often and gave different addresses whenever asked. As the couple stated in their divorce petition, by November 2006, Mouzer was no longer living with Dos Reis and the marriage had irretrievably broken down.[1]

The government relies on the lack of documentary evidence regarding the plaintiff's married life to argue that the marriage was a sham. The couple did not commingle their finances

---

[1] This timeline is consistent with Dos Reis's tax filings which list his filing status as either "single" or "married filing separately" after 2006. Exs. 1, 40, 78.

and Mouzer's name is not on the deed or mortgage to 59 Michele Drive. Dos Reis set up a joint bank account with Mouzer which he later closed after she overdrew the account. Dos Reis bought her a car. However, before and during their marriage, Mouzer had no financial assets to commingle. Mouzer's lack of credit provides a plausible explanation for not adding her name to the mortgage.

The government also relies on the fact that Dos Reis had two children with other women during his marriage to Mouzer. However, Dos Reis's ex-girlfriend became pregnant with his second child before or shortly after he met Mouzer. By the time Lima became pregnant in October 2007, Dos Reis and Mouzer were no longer living together and the marriage had effectively collapsed. These extramarital children do not bear on Dos Reis's intent to start a married life with Mouzer at the beginning of the marriage. Therefore, the Court finds that Dos Reis entered into his marriage in good faith and that his permanent resident status was lawfully obtained.

### B. Bad Moral Character

"No person . . . shall be naturalized unless such applicant, . . . during all the periods referred to in this subsection has been and still is a person of good moral character . . . ." 8 U.S.C. § 1427(a). The INA further states:

> In determining whether the applicant has sustained the burden of establishing good moral character . . . the Attorney General shall not be limited to the applicant's

16

conduct during the five years preceding the filing of
the application, but may take into consideration as a
basis for such determination the applicant's conduct and
acts at any time prior to that period.

8 U.S.C. § 1427(e). The statutory period of good moral character

"includes the period between the examination and the

administration of the oath of allegiance." 8 C.F.R.

§ 316.10(a)(1).

   i.   False Testimony

   "No person shall be regarded as, or found to be, a person

of good moral character who, during the period for which good

moral character is required to be established, is, or

was . . . one who has given false testimony for the purpose of

obtaining any benefits under this chapter." 8 U.S.C.

§ 1101(f)(6). "The Supreme Court has held that false testimony

under 8 U.S.C. § 1101(f)(6) is limited to 'oral statements made

under oath' and 'misrepresentations made with the subjective

intent of obtaining immigration benefits.'" Toribio-Chavez v.

Holder, 611 F.3d 57, 65 (1st Cir. 2010) (quoting Kungys v.

United States, 485 U.S. 759, 780 (1988)). "The United States

concedes that [§ 1101(f)(6)] does not include other types of

misrepresentations or concealments, such as falsified documents

or statements not made under oath." Kungys, 485 U.S. at 780

(internal quotation marks omitted). "The absence of a

materiality requirement in § 1101(f)(6) can be explained by the

17

fact that its primary purpose is not . . . to prevent false

pertinent data from being introduced into the naturalization

process . . . but to identify lack of good moral character." Id.

"Whether a person has the subjective intent to deceive in order

to obtain immigration benefits is a question of fact."

Hovsepian, 422 F.3d at 887 (citing Kungys, 485 U.S. at 782).

In his April 5, 2011 interview, the USCIS officer placed

Dos Reis under oath and asked him to affirm or correct his

answers in his N-400 application for naturalization. Dos Reis

affirmed that he had been "married to and living with the same

United States citizen for the last three years." Ex. 65. In the

plaintiff's videotaped interview with USCIS on April 8, 2014, he

also stated, under oath, that he had lived with Mouzer until

their divorce in 2011. In their divorce petition, however,

signed by both Dos Reis and Mouzer less than three months after

the April 2011 interview under penalty of perjury, they affirmed

that they last lived together in November 2006. Ex. 72. This

Court finds that the affirmation in the divorce petition is

consistent with other evidence on the record that the couple

last lived together in November 2006. The Court finds that Dos

Reis intentionally lied under oath in his answers to obtain an

immigration benefit.

In the April 5, 2011 and June 13, 2013 interviews with

USCIS, the plaintiff answered no to the question: "Have you

**ever:** Failed to support your dependents or pay alimony?" Exs. 65, 77 (emphasis in original). At that time, the plaintiff had been held in contempt of the child support order for his second child three separate times by the Norfolk County Probate Court between 2007 and 2010 with arrearages between $2,400 and $9,000. Although never held in contempt with respect to support of his third child, he was frequently behind in his payments by as much several thousand dollars. At the time of the April 2011 interview, the plaintiff was still in arrears of his child support by over $10,000, an arrearage he corrected with a lump sum check to the Department of Revenue in May 2011. The record is unclear about the percentage of that lump sum payment that applied to each child.

When asked about his failure to disclose these lapses in his child support, Dos Reis claimed that he understood the question to ask whether he had supported his children emotionally and done his best to financially contribute to his children's welfare. The Court does not credit the plaintiff's explanation. The three contempt orders prior to his USCIS interviews are persuasive evidence of his failure to support his dependents and his answers under oath constitute false testimony in order to gain an immigration benefit.

Finally, in the plaintiff's videotaped interview with USCIS on April 8, 2014, while responding to questions about his

wedding day, he stated that Mouzer's mother had been present at the ceremony. Ex. 86. Both Mouzer and her mother testified that Mouzer's mother had not been present at the wedding. Mouzer's mother had only learned of her daughter's marriage months later. The Court finds that the plaintiff gave false testimony, under oath, with the intent to obtain an immigration benefit.

The plaintiff relies on Ajuz v. Mukasey for the proposition that he does not lack good moral character simply because he misunderstood USCIS's questions and answered them incorrectly under oath. See No. 07-MC-0185, 2009 WL 902369, at *4 (E.D. Pa. Apr. 2, 2009) ("[F]alse testimony due to a misunderstanding, a misinterpretation, or an innocent mistake is insufficient to deny citizenship for lack of good moral character." (quoting Saad v. Barrows, No. CIV.A. 3:03-CV-1342G, 2004 WL 1359165, at *6 (N.D. Tex. June 16, 2004))). In Ajuz, the court found that, despite answering a question incorrectly under oath, the petitioner had no intent to deceive and had simply misunderstood the question. Id. at *6. Additionally, the petitioner corrected his earlier false testimony at a subsequent immigration interview. Id. at *2. Dos Reis claims that he misunderstood the question about child support, but the Court finds that he adequately understood the concept of child support from his multiple interactions with the family and probate court. Additionally, the plaintiff's argument does not address his

other false testimony about living with Mouzer after November 2006 and Mouzer's mother attending his wedding. Finally, the plaintiff never corrected any of this false testimony in subsequent immigration interviews.[2]

The Court finds that the plaintiff did give false testimony under oath with the intent to deceive and to obtain the immigration benefit of naturalization. Therefore, the plaintiff has not proven that he is a person of good moral character sufficient to meet the qualifications for naturalization.

### ii.   Failure to Support Dependents

"The fact that any person is not within any of the foregoing classes [of § 1101(f)] shall not preclude a finding that for other reasons such person is or was not of good moral character." 8 U.S.C. § 1101(f). This provision is known as the "catchall provision." Sumbundu v. Holder, 602 F.3d 47, 51 (2d Cir. 2010). In this provision, "Congress delegated authority to the former INS to set forth 'other reasons' affecting determinations of good moral character." United States v. Jean-Baptiste, 395 F.3d 1190, 1194 (11th Cir. 2005) (quoting 8 U.S.C. § 1101(f)). "Pursuant to this authority, Congress

---

[2] Although the government claims that Dos Reis gave false testimony about his arrest record to USCIS, in both his April 2011 and June 2013 interviews, he disclosed his arrest for assault and battery of his ex-girlfriend. Ex. 65. He also disclosed his arrest for driving without a license in his June 2013 interview. Ex. 77.

delegated to the Attorney General authority to issue 8 C.F.R. § 316.10." Id. "Unless the applicant establishes extenuating circumstances, the applicant shall be found to lack good moral character if, during the statutory period, the applicant: (i) Willfully failed or refused to support dependents . . . ." 8 C.F.R. § 316.10(b)(3)(i).

Although the case law dealing with the willful failure to support dependents is sparse, courts agree that applicants for naturalization should not be punished if they were not at fault for failing to pay child support. See, e.g., Etape v. Napolitano, 664 F. Supp. 2d 498, 517 (D. Md. 2009) (finding that, even though the petitioner had amassed a $15,000 arrearage in his child support, "the arrearage amount was not due to Plaintiff's non-payment of child support," but rather to a calculation error committed by the court); In re Valad, 465 F. Supp. 120, 123 (E.D. Va. 1979) (finding no bad moral character where the petitioner stopped making child support payments "due to a misguided theory that . . . he was under no duty to continue the monetary payment").

As detailed in the discussion above, Dos Reis was found guilty of contempt "for having willfully neglected and refused to pay child support" two times within the statutory five-year period with arrearages of $2,400 and $9,038.45. Exs. 50, 60. Further, in 2010, the probate court noted that it "did not

22

credit the accuracy of the defendant's financial statement—he owns his own company, he has boarders in the home he owns." Ex. 60. The plaintiff was delinquent in his child support until he made a payment of $10,817.85 to the Department of Revenue on May 4, 2011.

Although Dos Reis testified generally that his business was not performing well and that he paid as much support as he could during those times, he has produced no documentary evidence to that effect. Further, the plaintiff purchased property in Brazil in 2009, and, between 2008 and 2011, he made six trips to Brazil and one trip to Mexico. He also received substantial cash payments in rental income. He has not proven to this Court that extenuating circumstances existed to explain his failure to pay child support. Therefore, this Court finds that because Dos Reis willfully failed to support his dependents, he has not proven that he is a person of good moral character.

### iii.   Failure to Pay Taxes

"It is undisputed that [ ] inaccurate tax filings do not fall within any of the *per se* categories of § 1101(f)." Sumbundu, 602 F.3d at 52. However, the Court can consider inaccurate tax filings for the purposes of assessing good moral character under the catchall provision of 8 U.S.C. § 1101(f). See id. at 56 (relying on "a decade-long pattern of gross under-reporting that was probably fraudulent," and emphasizing that,

during the period of fraudulent underreporting, the petitioners "appeared to take improper advantage of taxpayer subsidized housing"); see also Azize v. Bureau of Citizenship & Immigration Servs., 594 F.3d 86, 90 (2d Cir. 2010) (finding that if the petitioner "had not filed any required [tax] returns, he might not have been eligible for citizenship"). "The mere existence of errors in tax returns could not rationally be regarded as a basis for saying that a petitioner was not of good moral character. Failure to file, however, is quite another matter . . . ." Gambino v. Pomeroy, 562 F. Supp. 974, 985 (D.N.J. 1982).

To show that the plaintiff lacks good moral character based on inaccurate and late-filed tax returns, the government relies on cases where the petitioner either admitted his failure to properly report his income or failed to file any tax return. See, e.g., Abuhekal v. U.S. Citizenship & Immigration Servs., No. CIV. 10-4687 ADM/TNL, 2011 WL 2600709, at *6 (D. Minn. June 30, 2011) (finding the petitioner "admitted he did not properly report income or pay $89,000 in taxes due from 2000 through 2002"); Gambino, 562 F. Supp. at 985 (emphasizing the petitioner's admitted failure to file tax returns for four years); Sekibo v. Chertoff, No. H-08-2219, 2010 WL 2196271, at *4 (S.D. Tex. May 26, 2010) (finding that the plaintiff failed "to file tax returns for five consecutive years").

24

The government asks this Court to find that the plaintiff underreported his income from 2005 to 2011 based upon the disparity between his reported yearly adjusted gross income and his required mortgage payments. Although his income totals during those years appear too low to support his mortgage, the government fails to provide the detailed financial analysis required for this Court to make a finding that Dos Reis was actually underreporting his "adjusted gross income."

The government also points to Dos Reis's late-filed 2009 and 2011 tax returns. He did not file his 2009 tax return until March 31, 2011, and did not file his 2011 tax return until April 8, 2013. Exs. 71, 78. Filing returns late or with errors is not as serious as failing to file taxes altogether. These late returns do not support a finding that Dos Reis lacked good moral character.

Although Dos Reis admitted to receiving rental income in 2011, his 2011 tax return lists no "income or loss from rental real estate." Ex. 78. However, the record is unclear as to how much money he failed to report. His failure to report his rental income in 2011 does not rise to the level of bad moral character. Therefore, this Court will not find that the

plaintiff lacked good moral character based on the alleged

underreporting of his income and late filing of his tax returns.


## ORDER

The plaintiff's petition for naturalization (Docket No. 1)

is **DENIED**.


/s/PATTI B. SARIS_____
Patti B. Saris
Chief United States District Judge